MARY A. FARNUM, DAVID DU BOIS, SARAH JANE GARRETT and HELEN M. JOHNSON

*v.*

ROBERT M. BOYD, JR., and LEWIS J. MULFORD.

[Filed September 29th, 1898.]

A lawyer, employed by a testatrix with unsettled testamentary notions as to the disposition of her entire estate, to draw her will, can participate in her bounty, in a material degree, only after a very clear exhibition that his conduct was fair and unobjectionable, and that the testatrix exercised, with relation to her bounty to him, a judgment independent of the confidence induced by his confidential relationship to her.

---

On appeal from a decree of the orphans court of Essex county, that admits to probate, as the last will of Anna D. Bennett, two writings, purporting to be a will and codicil thereto.

*Mr. Charles D. Thompson,* for the appellants.

*Mr. S. J. Murphy,* of New York, for the respondents.

*Mr. Edwin B. Goodell* and *Mr. Joseph D. Gallagher,* for the legatees.

THE ORDINARY.

No question is raised as to the fidelity with which the requirements of the statute as to the making and execution of the dis-

Farnum v. Boyd.

puted papers here involved were observed, nor do I understand the appellants to seriously contend that Anna D. Bennett was, under all conditions and at all times, without testamentary capacity during the period within which the will and codicil were made. The contest rests rather upon their insistence that the will, in which is included both the will proper and the codicil, is the product of an undue influence that grew out of confidential relations then existing between Mrs. Bennett and the draughtsman of those instruments, Robert M. Boyd, Jr., and Lewis J. Mulford, the other respondent upon this appeal. The testimony offered to exhibit the mental condition of Mrs. Bennett does not touch the very time of the execution of either paper. It, in a general way, covers the period of time within which both instruments were executed, and appears to have been offered more with a view to show a weak mind, capable of being readily perverted and controlled, than with the expectation that it would satisfy a court that Mrs. Bennett lacked testamentary capacity. The latter position is so clearly untenable, under the proofs, that it may be dismissed at this point in our consideration without further remark.

That the woman was weak is quite apparent. She was somewhat eccentric, but that was scarcely distinguishable from the vanity, characterized by love of conspicuity, which she exhibited. She was tyrannical and cruel to dependents and those who would not resent her cruelty, and was also selfish, and in her selfishness, keenly appreciative of kindness. She was inexperienced in business ways and in the management of money, and hence in a degree ignorant. Her greatest weakness was the product of vanity, selfishness and ignorance, and not of mental disease. She well knew what property she had, the natural objects of her bounty, those who had been kind to her and the purpose and effect of will-making.

The house in which she and her husband had resided in East Orange was worth two or three thousand dollars. It had been purchased in her name by her husband. She does not appear to have had any other estate until the death of Mr. Bennett, in August, 1895, when she came in possession of about $11,000

from her husband's life insurance in her favor and about $2,000 additional from his estate. When Mr. Bennett died she was practically without relatives or friends capable of advising her or in whom she had confidence.

Her history is this: At the age of sixteen years she married a man named Handy, from whom she was subsequently divorced. By Handy she had one child, a son, who died in infancy. Later she married one Farnum, from whom also she was divorced. Then, some time prior to 1873, she married James Bennett, with whom she lived until he died in 1895, as has been stated. Her maiden name was Du Bois. She has one brother, David, and one sister, Jane, who afterwards married a man named Garrett, of the whole blood; and two sisters, Mary and Helen Hemingway, the children of her mother by her stepfather, of the half-blood. The former of these sisters of the half-blood married one Farnum, the brother of Mrs. Bennett's second husband, and the latter married one Johnson, from whom she has been divorced.

These sisters and brother are the caveators below and appellants here.

Mrs. Bennett died on the 30th of December 1896, sixteen months after the death of her husband, at the age of sixty-eight years. She and Bennett did not have any children. About the year 1873 they took to live with them the six-years-old daughter of Mrs. Bennett's half-sister, Helen Johnson, with a purpose to ultimately adopt her as their child. The girl was taught to address them as her parents, and they called her their daughter and treated her as such, but it does not appear that they ever formally adopted her. After she had lived with them eight or ten years she was sent to a convent in Canada to be educated, and later, against their consent, at the age of eighteen years, married a man named Cotherman, of Chicago, and went there to live. After several years, in order that they might have Mrs. Cotherman near them, Mr. Bennett found employment for Cotherman in the east, and Cotherman, his wife and children moved to Newark, in this state, where they now reside. It is clear that Mrs. Bennett always disliked Mr. Cotherman. She did not hesitate to try and induce his wife to leave him and re-

turn to Mrs. Bennett's home and become her companion, by the promise that if she would do so she should be the sole beneficiary under Mrs. Bennett's will.

The relations between Mrs. Bennett and Mrs. Cotherman, after the latter took up her residence in Newark, varied. At times they exhibited friendship for each other, and at other times they quarreled and became estranged. In January, 1896, a child of Mrs. Cotherman died of membraneous croup. Mrs. Cotherman telephoned to Mrs. Bennett to come to her assistance. At first Mrs. Bennett assented, but later telephoned that her physician advised that the disease was dangerous and forbade her to come, and consequently she would not do so. After that the two women did not meet until May, 1896, when Mrs. Bennett called upon Mrs. Cotherman, and, although she repeatedly cried under Mrs. Cotherman's reproaches, she was told she could thereafter go to the wife of her coachman, one Maffy, presently mentioned, for favors. After that Mrs. Cotherman failed to visit Mrs. Bennett until the latter became unconscious in her last illness.

Early in life Mrs. Bennett and her brother and sister of the whole blood drifted apart. The brother became a seafaring man, and, the evidence seems to indicate, dissipated in his habits. He is now rheumatic and a pensioner upon the city of East Saginaw, Michigan. The sister married first one and then another physician, and is now supported in a masonic home at Grand Rapids, Michigan. After the death of Mr. Bennett, Mrs. Bennett told the appellant Mary A. Farnum that she was going to make a will, and asked if Mrs. Farnum knew anything of "Dave and Jennie." It does not appear that she was aware of their destitution. The proofs show, as the will suggests, that the half-sister, Mrs. Johnson, has abundant means.

It appears, further, that William Maffy, who with his wife and child are legatees for $100 each, used to drive Mrs. Bennett every day. He was an employe of one Chester Howe, a livery-stable keeper with whom Mrs. Bennett boarded her horse, upon an arrangement that she should be driven an hour and a half each day. Occasionally, when Maffy did not drive her, Mr.

Howe would do so himself. Both men were constant in their kindness to her.

After her husband's death Mrs. Bennett became a member of St. Paul's Episcopal Church, of East Orange, and the recipient of many attentions and kindnesses from its rector, Mr. Williams, and Miss McKinney, to whom the rector was engaged to be married, and Miss McKinney's mother. She gives to the church, the rector and Mrs. and Miss McKinney each $200.

Her husband died intestate, leaving an estate valued at about $3,000. She became the administratrix of this estate, giving bond upon which Lewis J. Mulford and O. S. Bogert were sureties. She claimed that her husband was indebted to her beyond the amount of his estate, and ultimately took the entire estate for her debt, to the exclusion of Sanford Bennett and Laura Bennett, a brother and sister of her husband, from any participation in it. Besides the accommodation by Messrs. Mulford and Bogert as bondsmen, their wives were kind and attentive to Mrs. Bennett. More than this, Mr. Mulford had been an acquaintance of Mr. Bennett for several years and knew Mrs. Bennett slightly, and when he heard of Bennett's sudden death, knowing that the widow was practically alone, he called upon her and offered his assistance, which she accepted; and afterwards he aided her in collecting three insurances upon her husband's life, and a month after her husband's death, introduced her to the respondent Boyd, a lawyer, through whom she settled her husband's estate. To Sanford and Laura Bennett the will gives $500 each, as the equivalent of that which they would have taken from Mr. Bennett's estate if Mrs. Bennett had not absorbed it with her claim; to Mr. Bogert the will gives $200 and to his wife $100, and to Mr. Mulford and his wife $250 each, in addition to other provision for them, which will be presently referred to.

Dr. Graves was her physician. Mr. Boyd was her lawyer, Dora Voss was her servant and Lizzie Budd was an old friend; to each of them the will gives $100.

It thus appears that, out of an estate now worth some fourteen or fifteen thousand dollars, she bequeathed specified sums,

aggregating $2,100, to persons outside of her own and her husband's family, who were her associates and had been attentive and kind to her, and that she gave $1,000 to her husband's brother and sister, and $500 to her half-sister Mary Farnum, and $500 to Mrs. Cotherman and her children. The will does not refer to her brother and sister of the whole blood. That she had them in mind while the will was in contemplation appears. It is but a just inference, I think, after the lapse of so many years—perhaps half a century—without communication with them and in ignorance of their circumstances, that she determined that they had no longer claim upon her bounty. Her half-sister Helen was possessed of abundant means, and for that reason did not share in her estate. It does not appear that Mrs. Farnum is in necessitous circumstances.

The will was executed on the 1st of June, 1896. By it the residue of her estate, after the legacies to the friends and relatives mentioned, is disposed of as follows : Three hundred dollars to the Mountainside Hospital Association of Montclair ; $500 to the Free Public Library of Montclair ; $500 to the Children's Home of Montclair, and the residue, several thousand dollars, to Mr. Boyd and Mr. Mulford, who were appointed the executors of the will, and the survivor of them, in trust for charitable and benevolent purposes. The codicil was made and executed on the 16th of October in the same year. It revoked two small pecuniary legacies, and then provided that about half of the residue should go to the wife of Lewis J. Mulford, and that the other half only should go to the executors in trust as already stated. It appears that Mr. Boyd was trustee of the Free Public Library of Montclair and a resident of that town.

The respondents have not offered any direct evidence of fraud in the production of the will. They rely for the rejection of the instruments disputed upon presumption and inference from these facts which they contend have been established by the proofs : That Mrs. Bennett was eccentric, erratic and unsettled in her testamentary purpose ; that Mr. Boyd occupied the confidential relation of her legal adviser and as such was engaged in the preparation of the disputed instruments, and that the outcome

of his employment was a will which gives him a legacy of $100, an executorship of some pecuniary value and an interest in the large residuary estate upon a trust which they claim is tantamount to an absolute gift to him, besides providing three legacies, which aggregate $1,300, for three institutions in the place of his residence, in one of which he was a trustee, and giving to Lewis J. Mulford, a friend of Boyd, who had introduced him to the testatrix, and who had gained the gratitude and confidence of Mrs. Bennett by his services already adverted to, an executorship, a legacy of $250 and an interest with Boyd in the residuary estate and trust as stated, and for Mulford's wife a legacy of $250 and half the residuary estate. It is claimed that fully two-thirds of the estate is directed by the will in a course probably pleasing to Messrs. Boyd and Mulford, though when that was made the testatrix had not known either of those men a year.

I agree with counsel for the appellants that both these gentlemen were her confidential advisers, one professionally and the other in the assumption of position of adviser, in which he became intrenched by the performance of acceptable offices for her.

It clearly appears in the proofs that when Mrs. Bennett applied to Mr. Boyd for assistance in making her will, her testamentary purpose was not complete. Beyond her general intention to dispose of her estate by will and her conclusion upon a few small pecuniary bequests, which would not exhaust one-third of her estate, she was unresolved and open to adopt any plausible suggestions. I agree with the contestants that the position of Mr. Boyd gave him such mental ascendency over his client that his participation in her bounty, in any material degree, can be allowed only upon the clearest exhibition that his conduct was fair and unobjectionable, and that Mrs. Bennett exercised a judgment in dispositions in which he is concerned, capable of independence of the confidence induced by the relationship between them. The presumption from the relationship and the benefit ensuing to Mr. Boyd from the will, is against the validity of the provisions of the instruments relating to Mr. Boyd. The bequest to him of $100, in view of a like gift to

Farnum *v.* Boyd.

the physician of the testatrix, is not of great significance; nor is his appointment as executor with Mr. Mulford unnatural when it is considered that Mrs. Bennett did not have a male connection in situation to take the office, except perhaps Mr. Cotherman, with whom she had never been upon confidential or even friendly relations. Grave question arises chiefly upon the disposition of the residuary estate. As to that the language of the will is :

"All the rest, residue and remainder of my property, both real and personal, I give, devise and bequeath to my executors below named and the survivor, their heirs and legal representatives. I trust that they will use this for charitable and benevolent purposes."

And the language of the codicil is this :

"All the rest, residue and remainder of my property both real and personal I direct to be divided into two parts of equal value after my diamonds, jewelry, watches and other articles of personal ornament have been sold—one of such two equal parts I give, devise and bequeath to Caroline T. Mulford, wife of Lewis J. Mulford of Montclair, New Jersey, and the other equal part I give, devise and bequeath to my executors below named and the survivor, their heirs and legal representatives. I trust that they will use this for charity and benevolent purposes."

The testimony of Mr. Boyd is that when, in course of her instructions to him for the preparation of her will, she reached the disposition of the residue of her estate she said that she wanted him, Boyd, and Mr. Mulford to have the residue, and that he demurred, so that it was arranged that the executors should take the residue, not for their own benefit, but in trust for charitable and benevolent purposes, and the will was accordingly so drawn, and after repeated readings approved by Mrs. Bennett.

It is remembered that the will was executed at the beginning of the summer. During the summer Mr. Boyd went to Canada, and he and his client were separated so that they did not meet until fall. In October the instructions for the codicil were given and then Mrs. Bennett said that Mrs. Mulford had been good to her during the summer and should have half the residue, and Mr. Boyd accordingly prepared the codicil, which was examined

and approved by Mrs. Bennett. This change appears to have been readily acquiesced in by Mr. Boyd as by one without having or assuming authority to question it. Mrs. Bennett then took the will and codicil from him and gave it to Mr. Mulford to keep. If Boyd dominated the will of Mrs. Bennett and believed that he had so worded the will that he and Mr. Mulford would take the whole residue free from trust, as has been suggested, it is difficult to perceive why he would permit the sacrifice of half his holding to Mrs. Mulford, and then permit both will and codicil to be taken from his custody to Mr. Mulford's for safe-keeping.

The change effected by the codicil appears rather to be in harmony with his testimony that in drawing the will he merely carried out her purpose, except in respect of an absolute gift of the residue to himself, where he advised a trust for benevolence and charity.

It is true he named three Montclair charities, in one of which he was interested as trustee, but that suggestion was upon her request, and was not acquiesced in by Mrs. Bennett, if Mr. Mulford is to be believed, until Mulford endorsed them.

I have but little doubt that the language of the will and codicil creates a trust of the residue, at least so far as that part of the residue which is devised and bequeathed to the executors and the survivor of them, is concerned. *Eberhardt* v. *Perolin, 3 Dick. Ch. Rep. 592, 596.* Perhaps it may be held otherwise of the portion devised and bequeathed to Mrs. Mulford. It seems to me to be very doubtful whether the trust can be sustained. *Thomson's Executors* v. *Norris, 5 C. E. Gr. 489, 523.* But if it is not sustained, the trustees will not profit individually. They will be decreed to hold the residue in trust for the heirs-at-law and next of kin of Mrs. Bennett. *Smith* v. *Smith, 9 Dick. Ch. Rep. 1; S. C., 10 Dick. Ch. Rep. 821.* I am satisfied that neither Mr. Boyd nor Mrs. Bennett thought that Boyd would take for himself, under the will, anything more than $100 and the executorship. I have very carefully examined Mr. Boyd's testimony and am satisfied that he acted fairly in dealing with

his client, and did not control her will, or in any manner improperly influence her.

There would seem to be more reason, so far as the disposition made by the will is concerned, to criticise the Mulfords, because, in addition to a taking by Mr. Mulford of a larger pecuniary legacy than Boyd, Mrs. Mulford, by the codicil, takes half the residuary estate (Mr. Boyd says that Mrs. Bennett explained that this gift was to requite kindnesses extended while he, Boyd, was in Canada), and the latter gift by codicil is followed by a transfer of the custody of the instruments to Mr. Mulford.

But as to the Mulfords, there is not a particle of evidence to show the least effort upon the part of either to control Mrs. Bennett's will. Mr. Mulford knew that there was to be a will, because he was asked to be an executor, and was asked with reference to the Montclair charities, but, if he is believed, and no reason appears why he shall not be, he knew nothing more about the will until it was brought to him by Mrs. Bennett to put in his safe.

I have no difficulty in concluding that Mrs. Bennett possessed testamentary capacity, and that she cannot, under the testimony, be held to have been unduly influenced in the making of either will or codicil.

I will affirm the decree appealed from.